FILED
U.S. DISTRICT COURT
DISTRICT

2026 JUL 27 PM 3: 15

OFFICE OF THE CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEBRASKA
CASE No. 8:22-CR-15-001

JOHN STRATMAN,
    Defendant/Movant,

       v.

UNITED STATES OF AMERICA,
    Respondent,

NEW SUPPLEMENTAL EMERGENCY MOTION
FOR COMPASSIONATE RELEASE / REDUCTION IN
SENTENCE [UNDER NEW CIRCUMSTANCES]

---

DEFENDANT'S/MOVANT'S NEW SUPPLEMENTAL EMERGENCY MOTION FOR COMPASSIONATE RELEASE /
REDUCTION IN SENTENCE [UNDER NEW CIRCUMSTANCES] PURSUANT TO 18 U.S.C. SECTION
3582(c)(1)(A)(i)(ii)(iii) AND THE NEW AMENDED FIRST STEP ACT OF 2018

---

COMES NOW, Defendant/Movant John Stratman "Stratman" appearing pro se, moves this Honorable Court with his New Supplemental Emergency Motion for Compassionate Release / Reduction in Sentence Under New Circumstances Pursuant to 18 U.S.C. Section 3582(c)(1)(A)(i)(ii)(iii) and the New Amended First Step Act of 2018. Stratman files this Motion in conjunction with the Motion that is now before this Court. He now raises new circumstances and asks that it be considered an Emergency Motion based on the fact that he is now in imminent danger of amputation of his left arm. The wound appears to becoming progressively worse each day. This news is affecting him physically as well as psychologically. Stratman is also fearful that the cancer has already spread from his arm to his upper body. He would also like to inform the Court that there are inmates on the 5th Floor hospital who have tested positive for COVID-19. They have isolated those inmates, but have yet to test inmates who have come in contact with them. If one was to go on the BOP's website, it would indicate that there are no positive cases of COVID-19 here at FMC Butner. He is an elderly man with several high-risk factors that, if he should contract COVID-19 again, it can cause him severe illness or death. Stratman's providers are not offering him a second opinion, but are aggressively trying to persuade him to allow them to amputate his arm. They gave him a four-page illustration of prosthetics, and they are urging him to go along with the amputation and are blatantly denying him a second opinion. Stratman's medical conditions are likely to become a DE FACTO Death Sentence if the Court does not release him on this Motion. The only prudent response to the extraordinary and compelling circumstances created by his terminal illness.

1

DISCUSSION

As a preliminary matter, Stratman respectfully requests that this Honorable Court be mindful that pro se litigants are entitled to liberal construction of their pleadings. See, U.S. v. HERNANDEZ, 627 F .3 1331 (10th Cir. 2010) ("Pro se pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore be liberally construed."); ESTELL v. GAMBLE, 429, U.S. 97, 13 (1976); HINES v. KERNER, 404 U.S. 519, 520 (1972) (same).

As a general note, his offense conduct was no doubt serious, but "falls short of being so atrocious that society's interest in deterrence and retribution wholly outweighs any considerations of reform or rehabilitation." HUNTER, 770 F .3rd at 747 (quoting HARMELIN v. MICHIGAN, 501 U.S.C. 957, 1028 (1991) (STEVENS J. DISSENTING)). As one Judge in this district recently reasoned, "the Court does not minimize the seriousness of [the defendant's] crimes, many of which involved firearms. But none of these crimes merit a death sentence, which is what incarceration in the current environment may become for those with health conditions as serious as [his]." UNITED STATES v. TRICE, 12-CR-96-PAM-JSM, DOC 64 (D. Minn. Aug. 7th 2020). Viewed in light of Mr. Stratman's post-offense conduct, a grant of his Motion satisfies to the sentencing considerations in the present context.

Mr. Stratman is a 77-year-old Caucasian man. He has already been incarcerated for over 46 months on a 135 month sentence. He has multiple very serious medical conditions. While incarcerated, he suffered a very serious injury while sitting at the table in the chow hall (kitchen). The table fell over breaking his foot and ankle leaving him with a permanent limp and excruciating pain on a regular basis. This incident took place over a year ago, and they have yet to repair that same table. That was not just a case of negligence, but to ignore the danger of that table injuring someone else, is a description of deliberate indifference. He is not attempting to make a civil claim in this Motion, he is only trying to highlight this issue along with other issues to ask for Compassionate Release. This should not be too much to ask for a 77-year-old man. We ask that the Court take a look at the following:

INCARCERATION SHORTENS LIFE EXPECTENCY

Each year in prison takes two years off an individual's life expectancy. With over 2.3 million people locked up, mass incarceration has shortened the overall U.S. life expectancy. New research expands the notions of collateral consequences beyond post-release barriers and discrimination. Two studies show that incarceration shortens life expectancy, at both the national and individual levels.

2

Nationally, there are so many people living behind bars that the average life expectancy for the total U.S. population has taken a hit. In 2014, the life expectancy at birth in the U.S. was 78.8 years, while most comparable nations (Spain, Sweden, Switzerland, France, Germany, Canada, Australia) had life expectancies above 81 years.

A 2016 study by Professor Christopher Wildeman offers us an explanation for the U.S. falling behind on measures of population health, like life expectancy: mass incarceration. In comparison to other developed democracies, Wildeman finds that from 1981 to 2007, the U.S. life expectancy would have increased by more than five years from 74.1 to 78.8 years - if not for mass incarceration. But given the reality of mass incarceration, the U.S. life expectancy only increased 3.5 years over that time. Without so many people behind bars, he argues, the life expectancy at birth would have increased 51% more than it actually did from 1981 to 2007. The sheer magnitude of how many people are locked up shortens our entire nation's life expectancy.

This isn't just problematic from a population health standpoint; the reduced life expectancy resulting from incarceration impacts individuals, families, and communities on a personal level. In her 2013 Analysis of New York State parole data, Professor Evelyn Patterson identified a linear relationship between incarceration and life expectancy: for each year lived behind bars, a person can expect to lose two years of life expectancy. In the parole cohort she studied, five years in prison increased the odds of death by 78% and reduced the expected life span at age 30 by 10 years. Time served has a direct correlation to years of life lost. It is important to address the appalling conditions of incarceration and the lack of opportunities and services for at-risk communities. Most importantly, we need to put less people behind bars. As Professor Patterson points out, unlike many collateral consequences of incarceration, "death cannot be reversed." The above data was compiled and updated in March 2021 by Emily Widra, a Senior Research Analyst at the Prison Policy Initiative.

The above is not new law or new policy for that matter, but rather, it is something that we ask the Court to consider. We beleive that the Court is not made up of robots, but people who must consider humanity. Mr. Stratman is a 77 year old man who did something that society considers horrific. We ask that the Court consider Mr. Stratman's humanity and not make him die in prison for a crime that did not call for a death sentence. So, lets go back and speak to the life expectancy study. It's ironic that we speak of life expectancy, especially with seeing that his life expectancy, is actually less than 18 months and if this Motion is not considered his sentence will become DE FACTO DEATH SENTENCE. And although his crimes are very serious, the question here is, are they so atrocious that he deserves to die in prison. We ask that the Court consider this fact and reduce his sentence to time served

3

and Court ordered supervised release. It is important for the Court to consider the fact that Mr. Stratman has never been incarcerated and has absolutely no criminal history. The chances of him reoffending is minimal, not to mention that he will be under the watchful eye of the DOJ for the rest of his life. Study shows that people with no criminal history, and their first time incarcerated will more likely than not ever reoffend after serving a prison experience. And because of the charges, Stratman's sentence was served in a state of fear of harm simply because of the nature of the crime that he was convicted of. Defendant's with sex offense charges have a very hard time in prison, surely the Court is aware of this.

There is a wide array of restrictions that the Court can place Stratman under when released on top of a life time of Supervised Release. If released he will reside in an apartment that is currently reserved for him by the landlord. There will be no computers in the residence nor will he attempt to possess one or use one. He will never make the mistake that he made in such a mature age in his life.

When released, he intends to participate in an Sex Offender Treatment (SOT) program in the community. If there is not one in his community, he intends to find one outside of his community. He intends to spend the rest of his life reading books to the elderly in the nursing homes. He loves to read, so he will be doing something that he enjoys to do. Now, while incarcerated, that's what helps him. So when he finishes one book, he purchases another. This is his day-to-day activities.

The doctors are insisting that they amputate his arm from the shoulder down. The radius of the cancer is right above the elbow. When he asks "Will removing the arm change my terminal diagnosis?" The answer he receives is, "No!" So, he sees no reason to allow them to cut his arm off if it won't even save his life.

4

IN PARTICULAR, THIS COURT HAS THE AUTHORITY UNDER 18 U.S.C. SECTION 3582(c)(1)(A) REVISED POLICY STATEMENT TO REDUCE MR. STRATMAN'S SENTENCE AS DESCRIBED BELOW

Section 1B1.13 Reduction in Term of Imprisonment Under 18 U.S.C. Section 3582(c)(1)(A) (Policy Statement)

(a) IN GENERAL -- Upon Motion of the Director of the Bureau of Prisons or the Defendant pursuant to 18 U.S.C. Section 3582(c)(1)(A), the Court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. Section 3553(a) for the offense, to the extent that they are applicable, the Court determines that --

(1)(A) extraordinary and compelling reasons warrant the reduction; or

(B) the Defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. Section 2559(c) for the offense of offenses for which the Defendant is imprisoned;

(2) the Defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. Section 3142(g); and

(3) EXTRAORDINARY AND COMPELLING REASONS -- Extraordinary and compelling reasons exist under any of the following circumstances or a combination therefore;

(1) Medical circumstances of the Defendant --

(A) The Defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end-of-life trajectory). A specific prognosis period) is not required. Examples include metastatic solid-tumor cancer amyotrophic lateral sclerosis (ALS) end-stage organ disease, and advanced dementia.

(B) The defendant is --

(i) suffering from a serious physical or medical condition,

(ii) suffering from a serious functional or cognitive impairment, or

(iii) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the Defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(C) [THE DEFENDANT IS SUFFERING FROM A MEDICAL CONDITION THAT REQUIRES LONG-TERM OR SPECIALIZED MEDICAL CARE THAT IS NOT BEING PROVIDED AND WITHOUT WHICH THE DEFENDANT IS AT RISK OF SERIOUS DETERIORATION IN HEALTH OR DEATH]

5

The 1B1.13 was revised and a person does not have to be terminal. If not for one of the factors he raised, then all of the factors combined certainly meets the criteria for Extraordinary and Compelling Reasons to grant this Motion. John Stratman is a Health Care Level 4. Which means that he is required to live in a hospital setting. One would think that because he is in a Medical Center that he is receiving excellent care. Nothing could be further from the truth! In fact, FMC Butner has a well documented history of negligence and abuse towards inmates housed in this institution, see NPR enclosed. To add to the NPR Report, we find it necessary to update the current issues that are taking place at FMC Butner. In particular on the fifth floor, the so called "Comfort Care Unit" where inmates are bedridden, are left laying in their feces and urine saturated sheets for several hours. There are also incidents where inmates are disconnected from Life Saving IV Medications and tricked into signing "Do Not Resuscitate Orders". This is the case with most inmates who are housed on the Comfort Care Unit. Doctors and Nurses on that Unit have no fear of being caught committing these atrocities. Most of these inmates don't have families and they know it.

Again, while Mr. Stratman's crimes are very serious, the question we ask this Court is, are they so atrocious that he deserves to die in prison. Stratman is in imminent danger of having his left arm amputated. They are aggressively trying to encourage him to have that surgery done soon.

### Increased Risk From the Confluence of Health Conditions

While each of these conditions should be compelling on their own, Mr. Stratman's true vulnerability cannot be assessed by evaluating these risk factors in isolation. Rather, due to his terminal diagnosis and the confluence of his challenges, he should be considered for immediate release.

### The Section 3553(a) Factors Support Mr. Stratman's Immediate Release

There are general sentencing factors contained in Section 3553(a) and recited above. Binding precedent establishes that the Section 3582(c) decision applies to the person who Mr. Stratman is today, not the person that this Court sentenced over three and one half years ago. While that may not be a significant amount of time for Mr. Stratman, coming to prison has been a huge wake up call for him. Under Pepper v. United States, 562 U.S. 476, 490-93 (2011), the Court can, indeed must, consider post-offense developments under Section 3553(a), as these provide "the most up-to-date picture" of the defendant's history and characteristics and "sheds light on the likelihood that [the defendant] will engage in future criminal conduct."

6

It is often said that the truest test of a man's character is what he does when he thinks no one is watching. By that standard, the proof of Mr. Stratman's character growth is nothing short of remarkable. For the past close to four years, Mr. Stratman has been serving 135 months. Mr. Stratman has been in his room reading his Bible and praying to God to touch the heart of the Court and release him on this Motion. For he fears that there is no hope of ever stepping outside of a prison-society again because of his terminal illness. Still, Mr. Stratman has fully committed himself to spiritual self-improvement, despite having been sentenced to 135 months with a terminal diagnosis of death in the near future.

Mr. Stratman is fully committed to leading a law abiding life, and to becoming the kind of positive male influence in his community for the very short time that he has left. He wants to go to senior citizens nursing homes and read to the visually impaired. This is something he enjoyed doing in his past. Even though he has a short time to live, he will feel comforted in reading to the elderly. As a preliminary note, his offense conduct was no doubt serious, but "falls well short of being so atrocious that society's interest in deterrence and retribution wholly outweighs any consideration of reform or rehabilitation." Hunter, 770 F.3d at 747 (quoting Harmelin v. Michigan, 501 U.S. 957, 1028 (1991)(Stevens, J. dissenting)). As one judge recently reasoned, "the Court does not minimize the seriousness of [the defendant's] crimes, many of which involved firearms. But none of these crimes merit a death sentence, which is what incarceration in the current environment may become for those with health conditions as serious as [his]." United States v. Trice, 12-CR-96-PAM-JSM, Doc. 64 (D. Minn. Aug. 7th, 2020). Viewed in light of Mr. Stratman's post-offense conduct, a grant of his Motion satisfies the sentencing considerations in the present context.

There is no question that Mr. Stratman's crimes were very serious. The question is whether or not they were so atrocious that he deserves to die in prison. Mr. Stratman is only asking to allow him to die around people that love him.

## PLAN FOR EMPLOYMENT

Mr. Stratman is a veteran and when released will receive Veteran's Disability and Social Security Income (SSI) benefits.

## HOME PLAN

Mr. Stratman intends to reside, upon his release, at 1013 S. Sherman Ave. Sioux Falls, South Dakota, 57103. He will actually live in his own unit in the building. His home plan has been previously approved by the probation department. He will not be within 700 yards of a school. He is also ready and willing to comply with any other restrictions this Court deems appropriate.

7

In Closing, all of the above information is indicated in his original Motion for Compassionate Release. However, the circumstances has changed drastically. It is undisputed that Mr. Stratman is dying. It is also undisputed that he is in imminent threat of losing his left arm from the shoulder down. The purpose of his sentence has been met. He is only asking to allow him to return home and die with a little dignity.

## CONCLUSION

For the above reasons, Mr. Stratman, his family, and all those in support of him pray that this Honorable Court will grant his Motion for Compassionate Release / Reduction in Sentence under 18 U.S.C. Section 3582(c)(1)(A)(i) and the Amended First Step Act of 2018 based on the multiple issues he raises in this Motion. Mr. Stratman files this Motion with great remorse and prays that one day God will forgive him; and he is also prayerful that this Honorable Court will show him mercy. This Court may consider other restrictions to include but not limited to a GPS monitor, and strict curfews.

Mr. Stratman asks the Court to allow him to die at home rather than alone at FMC Butner on the Cancer Ward.

Submitted this 10th day of July, 2026.

Respectfully Submitted,

John Stratman, ID# 91872-509
Case No. 8:22-CR-15-001
FMC Butner
P.O. Box 1600
Butner, NC 27509

✳ Hanger Clinic

# Upper Limb Prosthesis Wear & Care Guide

Your upper limb prosthesis has been custom-designed to help you achieve your personal rehabilitation and functional goals. These instructions will help you learn how to put on your prosthesis, care for your skin, and clean your device. There are a variety of upper limb prosthesis types. In addition to these general instructions, you will also be provided with guidance specific to your prosthesis on a typical wearing schedule, treatment plan, and follow-up appointment schedule. If you have any questions about your prosthesis or care plan, please contact your prosthetist.

## WHAT TO EXPECT

Your prosthetist will ensure your prosthesis fits well and that you feel comfortable putting it on and taking it off. Regular follow-up appointments are important to check the fit and function of your prosthesis, along with your ongoing rehabilitation goals. Please follow all instructions from your doctor, prosthetist, and therapist, as each person's prosthetic system is unique. Always feel free to speak with your prosthetist about any questions or concerns, and keep the following in mind:

- Be sure to increase wearing time with your new prosthesis gradually.

- If you notice any damage or unusual noises from your prosthesis, call our office as soon as possible.

- If you gain weight, lose weight, or the fit changes, make an appointment to check your fit.

- Visit your prosthetist every six months for a checkup, even if everything is going well.

- After receiving their prosthesis, most people find it helpful to work with a physical or occupational therapist to improve function. If you don't have a therapist working with your prosthesis, please notify your Hanger Clinic prosthetist, as they can often help you identify that assistance.

- Inform our office if you are moving so we can help you arrange for care at another of our more than 900 Hanger Clinic offices nationwide.



Hanger Clinic          CONNECT WITH US           HANGERCLINIC.COM

REV (03/25)    2025 HANGER CLINIC

## PUTTING ON AND REMOVING YOUR PROSTHESIS

Donning (putting on) and doffing (taking off) your prosthesis look very different depending on your type of device. Here are four methods for donning and doffing your prosthesis.

### Push-In Style

- Depending on how your socket was fit, prior to pushing your residual limb in, it may be dry or covered with a thin lubricant, like hand sanitizer.

- Position the socket opening over your residual limb, making sure it is properly aligned.

- Gently push your limb into the socket, applying even pressure until you feel resistance and a secure connection.

- To remove the prosthesis, locate the release mechanism or button, or break the suction seal from the socket.

- Gently remove the prosthesis from your residual limb.



### Pull-In Style

- To start, roll the donning sleeve over your residual limb. The donning sleeve minimizes friction as you pull your residual limb into the socket.

- Next, align the prosthesis by positioning the prosthetic socket opening over your residual limb and locating the pull-hole or valve opening.

- Guide the end of the donning sleeve into the pull-hole or valve opening, then gently slide your residual limb into the socket. Use a pulling motion on the end of the donning sleeve, working on small sections at a time.

- Once your limb is fully inserted and the donning sleeve is completely removed, you may re-insert the valve if necessary.

- To remove the prosthesis, locate the release mechanism or button, or break the suction seal from the socket.

- Gently remove the prosthesis from your residual limb.

### Liner Style

- Clean and dry your residual limb before putting on the liner.

- Next, roll the liner onto your limb and avoid pulling, which can cause discomfort or damage to the liner.

- Ensure the liner is smooth against your skin with no wrinkles or creases.

- Depending on your prosthesis, you may need to engage a pin or locking mechanism to secure the prosthetic arm to the liner.

- If you have a pin or locking mechanism, to remove the prosthesis you may need to press a release button on the lock or remove any strapping.

- Then, gently roll the liner back down your residual limb, maintaining a smooth motion.

   

### Sock-Fit Style

- To start, clean and dry your residual limb before putting on the sock.
- Next, start at the bottom of your limb and gradually pull the sock up, ensuring it is not too tight.
- Carefully position the prosthetic socket over your residual limb, making sure it is aligned correctly.
- Check for and smooth out any wrinkles in the sock to prevent discomfort.
- Additional socks can be added or removed as necessary.
- To remove the prosthesis, gently pull down on the socket and slowly slide the prosthesis off.

### Gel Liners

If you have a gel liner, you will roll it directly onto your arm, touching your skin. Before applying the liner, your limb should be clean, dry, and free of lotions. Attention to detail is very important to ensure the proper fit of your prosthesis. To apply a gel liner, roll it inside out so the gel faces outward. Place the liner at the end of your residual limb and gently roll the liner on so that there are no wrinkles or trapped air. If your liner has a pin, be sure that it is lined up correctly with the end of your limb.

### Suspension Sleeves

Suspension sleeves go on the outside of your socket and roll onto your arm.

### Prosthetic Socks

Prosthetic socks help maintain the comfort and performance of your prosthesis. If you have been given prosthetic socks, you should add or remove them to adjust the fit as instructed by your prosthetist. Your residual limb may change in size and shape throughout the day or from day to day. Prosthetic socks can help you manage these changes.

These changes are expected due to activity, fluid retention, temperature, and weight changes. If your limb gets smaller over time, you may need to wear additional socks to fill the extra space and possibly get evaluated for a new socket. Once you reach 8 to 10 ply of socks, please see your prosthetist for an adjustment.

Add socks over the liner and not directly on the skin unless otherwise instructed. Socks should always be pulled fully and smoothly over the limb because wrinkles can cause abrasions or irritate the skin. If you have a locking liner, check that the sock is NOT wrapped around the pin, as this may cause the sock to get stuck in the lock.

*When should you add a sock?*

- Adding a sock can aid in limb comfort, protection, and suspension by increasing the tightness of the socket. A feeling of looseness, rotation, or visible gapping indicates that your limb is falling too far into the socket. If you continue to feel discomfort, please get in touch with your prosthetist.

*Which sock should you add?*

- Socks come in different thicknesses called "ply." The color of the band at the top of the sock indicates its ply. Start by adding a 1-ply sock and increase the ply as needed. If you have added a sock, make sure that your limb still goes all the way into the prosthesis. Your socket should fit snugly to your limb. Socks can be worn in multiples. For example, wearing a green and a blue sock at the same time means the wearer has applied eight ply of socks.

*When should you remove a sock?*

- Remove a sock if your limb is not fitting all the way into the socket. Your arm or hand prosthesis will become a routine part of your everyday life. Your clinician will work with you on how to wear it properly and ensure the ideal fit.

## WEARING SCHEDULE

Your prosthetist will provide a personalized break-in schedule to gradually increase the amount of time you spend in your new prosthesis each day. In general, we suggest you start wearing it for 1/2 to 1 hour in the morning and the afternoon on the first day and then increase the morning and afternoon wear time by 1 hour each day until you've reached a full day of wear. Be sure to check your skin after each wearing period. A typical wearing schedule may look something like this:

| DAY | WEAR TIME |
| --- | --- |
| 1 | ½ hour morning, ½ hour afternoon/evening |
| 2 | 1 hour morning, 1 hour afternoon/evening |
| 3 | 2 hours morning, 2 hours afternoon/evening |
| 4 | 3 hours morning, 3 hours afternoon/evening |
| 5 | 4 hours morning, 4 hours afternoon/evening |
| 6 | 5 hours morning, 5 hours afternoon/evening |
| 7 | All day as desired. |

## SKIN CARE

### Skin Inspection

It is very important to keep a close eye on your skin. Check your skin several times daily using a mirror to inspect your limb. If you see red areas that do not clear up within 30 minutes of removing your prosthesis, blisters, or broken skin, do not wear your prosthesis until you speak with your prosthetist or until your skin heals completely.

### Sweat

Sweating is common, especially in hot weather. You may experience more sweating than usual at first. Don't worry; your body will typically adjust to produce less sweat when you wear your prosthesis. If sweating continues and you are concerned, talk to your prosthetist about recommended solutions.

### Swelling

During the first few months to a year of prosthesis wear, your residual limb will go through a maturation period, sometimes shrinking or swelling. If you experience swelling, try wearing your shrinker when your prosthesis is off, including when you sleep.

## CARE INSTRUCTIONS

Care of your prosthesis may vary based on your type of upper limb prosthesis. Here are some general care instructions.



### General

In general, gently wipe down the exterior of the prosthesis and clean the socket with a soft cloth and warm, soapy water. Ensure the prosthesis is completely dry before storing or wearing it again. Regularly check for any signs of wear and tear, loose components, or frayed cables. Take precautions to prevent moisture from getting into the prosthesis, especially around charging ports or battery compartments if you have them.



### Socket

Each day, you should wipe down both the inside and outside of your socket with a soft cloth to maintain cleanliness and extend the life of your prosthesis and supplies. You can clean the socket at night with soapy water or alcohol, leaving ample time for drying before using it again. Do not submerge in water, as most prostheses are NOT waterproof.



### Socks and Shrinkers

Socks worn directly on the skin should be washed at least once a day to maintain good hygiene of the limb. Rotate socks so you do not wear out any one sock too quickly. Wash by hand with mild soap and water and lay flat to dry. Avoid wringing socks or placing them in the dryer, as this may wear out the elastic.



**Body-Powered**

You can typically use soap on a body-powered device. At the end of the day, wipe your prosthetic socket (the inside), rinse well to remove any soap residue, and then either use compressed air to dry it or let it dry in a way that any water can drain and evaporate completely.



**Myoelectric**

Inspect the prosthesis daily for worn or frayed areas, loose components, and cable issues. Before turning a myoelectric prosthesis off for the day, place the hand or terminal device in an open position. Remove and charge the batteries. If there is an internal battery, be sure the prosthesis is switched off and then plug it in to charge using the battery charging cord. When cleaning the myoelectric prosthesis, it is important not to submerge it or get it wet unless specifically indicated by your prosthetist.

- Use compressed air to clean the prosthesis and blow away dust and debris, if available.
- Wipe down electrodes and prosthesis with a soft cloth.
- Avoid getting moisture in or around the charging port or battery.
- Clean gloves daily or when soiled with a damp cloth or sponge, but avoid immersing them in water. Rubbing alcohol or a waterless hand sanitizer should also be used to eliminate bacteria. If you notice a crack in a glove, inform your prosthetist.

## CONTROLLING YOUR PROSTHESIS

Depending on the components used in your prosthetic device, your Hanger Clinician will work with you and teach you how to control several important movements, including:

- Opening and closing the terminal device (hand)
- Rotating internally and externally
- Flexing or extending the elbow (higher level amputations)
- Flexing or extending the shoulder (higher level amputations)

With some of the more technologically advanced prosthetic systems, you'll learn how to control specific movements using various muscles throughout your upper body.




  



## PEER SUPPORT

The Hanger Clinic AMPOWER® program provides people with peer mentorship, educational resources, and community events. Start today by speaking with one of over 1,000 trained peer mentors nationwide and connecting with over 7,500 others with similar experiences.

Call **1-844-AMPOWER** to learn more.

## APPOINTMENT SCHEDULE

Your prosthetist will set a schedule to review your progress over the coming weeks and months. The chart below is an example of what your journey may look like.

| APPOINTMENT | ACTIVITY |
|---|---|
| Evaluation | • Learn about your needs and goals and obtain the necessary documents for insurance authorization.<br>• Take an impression or measurements and a cast or scan of your residual limb |
| Diagnostic Socket | • Check the fit of the prosthetic socket before making the final version |
| Delivery | • Fit and adjust prosthesis<br>• Demonstrate donning (putting on) and doffing (taking off) prosthesis<br>• Review the wearing schedule, cleaning instructions, and follow-up schedule |
| Follow-Up Call | • Check that everything is going well and answer any additional questions |
| Follow-Up Appointments | • Ongoing occupational and physical therapy<br>• Make any adjustments<br>• Review your prosthesis and rehabilitation goals |

**Your next appointment is on:** _____

As you go through this journey, remember you are not alone.
Your clinician is available to answer your questions and would be happy to connect you with people in your area who have been through this process before.

To learn more, visit **HangerClinic.com/UpperLimb**

 Hanger Clinic

CONNECT WITH US      |   **HANGERCLINIC.COM**

REV (03/25)    2025 HANGER CLINIC

Clerk's Office                                                              July 10th, 2026
United States District Court
For the Northern District of Nebraska
111 S. 18th PLZ Suite 1152
Omaha, NE 68102

                                        NEW SUPPLEMENTAL EMERGENCY MOTION
                                        UNDER NEW CIRCUMSTANCES

Dear Clerk,

   Please find enclosed two copies of the above referenced Motion. I ask that you file the original and return a

copy to me marked "Filed / Received." For your convenience, I have enclosed a self-addressed stamped envelope.


   I appreciate your assistance with this matter and I await your reply.


CC: United States Attorney's Office


                                        Respectfully Submitted,

                                        *John J. Stratman*

                                        John J. Stratman, ID# 91872-509
                                        Case No. 8:22-CR-15-001
                                        FMC Butner
                                        P.O. Box 1600
                                        Butner, NC 27509



FEDERAL ~~~ ~L CENTER
P.O. BOX 1600
BUTNER, NORTH CAROLINA 27509

DATE: 7/10/24

"SPECIAL/LEGAL MAIL"

The enclosed letter was processed through special mailing
procedure for forwarding to you. The letter has been
neither opened or inspected. If the writer raises a question
or problem over which this facility has jurisdiction, you
may wish to return the material for further information
or clarification. If the writer enclosed correspondence for
forwarding to another addressee, please return the enclosed
to the above address.



⇔91872-509⇔
John Stratman
Federal Medical Center
PO BOX 1600
Butner, NC 27509
United States

CERTIFIED MAIL

9589 0710 5270 2728 3778 50

PSDC 27495
14 JUL 2026

Retail

U.S. POSTAGE PAID
FCM LG ENV
BUTNER, NC 27509
JUL 13, 2026

68102

$0.00

RDC 99    S2322w501610-06

RECEIVED

JUL 27 2026

CLERK
U.S. DISTRICT COURT

USPS - 27509

LEGAL MAIL !

⇔91872-509⇔
Clerk Of Court
111 S 18TH PLZ
Suite 1152
Omaha, NE 68102
United States

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

⇔91872-509⇔
Clerk Of Court
111 S 18TH PLZ
Suite 1152
Omaha, NE 68102
United States

RECEIVED

JUL 27 2026

CLERK
U.S. DISTRICT COURT

9590 9402 9937 5335 4825 34

2. Article Number *(Transfer from service label)*

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X ☐ Agent
☐ Addressee

B. Received by *(Printed Name)*
LARRY L. WAYJDA

C. Date of Delivery
7-25-26

rent from item 1?  ☐ Yes
ddress below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form **3811**, July 2020 PSN 7530-02-000-9053

Domestic Return Receipt

USPS TRACKING #

‖‖‖‖‖ ‖‖‖

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

9590 9402 9937 5335 4825 34

United States
Postal Service

• Sender: Please print your name, address, and ZIP+4® in this box•

⇔91872-509⇔
John Stratman
Federal Medical Center
PO BOX :1600
Butner, NC 27509
United States